McCORD, Judge.
This is an appeal from a final judgment which upholds the Bay County tax assessor’s assessment of certain of the lands of appellants’, St. Joe Paper Company and St. Joseph Land and Development Company (hereinafter collectively referred to as “St. Joe”), for the years 1971, 1972 and 1973. St. Joe contends that the assessments were excessive, arbitrary, and contrary to the laws of the state and the regulations of the Department of Revenue and do not reflect the true value of the lands used for agricultural timberlands under § 193.461, Florida Statutes, known as the green belt law.
In 1967, the tax assessor caused a reassessment of the lands in Bay County to be made by Howze & Associates. As a result of the 1967 assessment, the timberlands of St. Joe in Bay County were divided into four classifications based upon the quality of the land for timber purposes. The lands within each of these classifications were assigned the following values for assessment purposes: Timberland No. 1— $65; Timberland No. 2 — $40-$45; Timberland Hardwood — $20; Swamp, Wasteland and Lakebottom — $5.
In 1971 the tax assessor reassessed appellants’ lands which reassessment consisted of four changes: (1) an increase of the assessments of lands classified as “swamp, wasteland and lakebottom” from $5 per acre to $25 per acre; (2) the moving of almost all the lands previously assessed as Swamp Wasteland ($5 per acre) to the Timberland Hardwood category ($20 per acre) and then raising the value of Timberland Hardwood to $40 per acre; (3) the moving of lands previously assessed as “Timberland Hardwood” at $25 per acre to the “Timberland No. 2” classification at $45 per acre; and (4) the moving of almost all of the lands previously assessed as “Timberland No. 2” ($45 per acre) to “Timberland No. 1” which was assessed at $65 per acre.
Chapter 195, Florida Statutes 1971, deals with state regulation of ad valorem taxation. The purpose of that law is stated in § 195.111 as follows:
“Purpose of this chapter. — It is hereby declared to be the legislative purpose and intent in this entire chapter to secure a just valuation and provide for a uniform and equal assessment as between proper *529 ty within each county or taxing district and as between property in each county and property in every other county or taxing district.”
§ 195.002 provides as follows:
“Supervision by department of revenue. —The department of revenue shall have general supervision of the assessment and valuation of property so that all property will be placed on the tax rolls and shall be valued accordingly to its just valuation, as required by the constitution. It shall also have supervision over tax collection and all other aspects of the administration of such taxes.”
In furtherance of supervision by the Department of Revenue, § 195.032 provides as follows:
“Establishment of standards of value.— In furtherance of the requirement set out in § 195.002, the department of revenue shall establish and promulgate standard measures of value not inconsistent with those standards provided by law, to be used by tax assessors in all counties, including taxing districts, to assist them in arriving at assessments of all property. These standard measures of value shall be deemed and held prima facie to be the standard measures of just valuation contemplated by the constitution of this state in matters of taxation. Tax assessors and tax adjustment boards shall follow and apply such standard measures of value in arriving at assessments of all property, and the burden shall be upon any assessor or board of tax adjustment refusing to follow such standards to overcome the presumption by preponderance of the evidence." (Emphasis supplied)
Here, the tax assessor did not follow the standard measures of value established and promulgated by the Department of Revenue, and thus the central question is whether or not he met the burden imposed upon him by the statute, He assessed the land for each of the three years at $4,955,335.00.
The Department of Revenue manual sets out the procedures for assessing timber-lands (standard measures of value). The first step is to determine the “site index” of a particular tract. This is the measure of the size of a pine tree that will grow on the particular tract in 50 years. This is accomplished by determining the height of the dominant trees in the stand and the age of the trees from borings made into sample trees. In addition, soil borings are also made to determine the quality of the soil. This information is applied to a table included in the manual and the result gives the site index for that particular tract. This index is then used to determine from another table the growth rate which is expressed in cords/per acre/per year. Various species of pine have different growth rates. Next the growth rate per year is multiplied by the “stumpage price” which is the value paid for wood growing at the site expressed in dollars per cord. Subtracting the average expense per acre from the result gives the net income per acre which is then capitalized under standard appraisal procedures to determine the value of that acre of land. This procedure is not foolproof. There are a number of judgment factors involved in making the assessments pursuant to the approved manual, just as there are in making any appraisal, but it results in a valuation of timberland based upon the revenue the land will produce from timber farming. It provides adequate standards for evaluation; the validity of the valuation can be adequately tested through cross-examination of the appraiser witness.
In this case the tax assessor was unable to relate any standards or criteria which he used to make his assessments. He merely took the four classifications of his previous assessment which he had made with the assistance of Howze & Associates *530 four years previously, added new classifications, shifted lands from lower classifications to higher and in addition raised the value of some of the classifications. This was done primarily from aerial photographs which had been used four years previously when the four original classifications were made. The assessor testified that he used an “educated guess” to change land from one category to another based primarily on the aerial photographs of his previous assessment and also from his memory of the field work he had done. As for his upgrading the value per acre, he testified:
“I looked it over and made a determination that Timber One looked more like $100.00 an acre. And I looked at Timber Two and it looked more like $60.00 an acre. And I looked at number three and found it looked more like forty to $45.00.

“My first determination was No. One Timber should be $100.00 an acre but I didn’t do that offhand. I went into the matter and I took my then $65.00 an acre, which I thought was the easiest way to do it since we had so many parcels and so little personnel to do it and to expedite the office work and we had so many tax rolls to look after .

“Well, actually if I had made exactly that determination I would come up with $100.00 an acre rather than $65.00. But I thought by combining the category One and adding more acres into the category One an assessment of $65.00, it would come out about the same rather than raising the value on Timber One that was already, I thought was reasonable.”
The assessor’s expert forester witness, Boyd, did not make an independent appraisal of the land. He spent two and one-half days examining the 87,000 acres involved in this suit to check classification differences between St. Joe’s two appraisers — not to determine site indexes or evaluate the land. He appraised all the lands as planted slash pine, even though most of it was in natural stands and approximately one-half of the natural stands were in long-leaf pine. (Different species of pine have different growth rates.) As previously stated, he made no independent appraisal of these lands but by picking and choosing various factors from the appraisals of St. Joe’s two experts, rejecting portions of these appraisers’ work, and adding some of his own, he arrived at a valuation in excess of the tax collector’s.
The Tax Assessor’s other expert witness, Merriam, who is in the insurance and real estate business, admitted that he was not an expert in this field. He used information given to him by witness Boyd and made his own calculations from it. He did not properly use the site index to determine growth rate and value. He also attempted to substantiate his values by comparable sales but did not show wherein and to what extent and degree such sales were comparable with the land in issue.
St. Joe, on the other hand, produced two appraiser witnesses (Sizemore and Robertson) who were experts in this particular area of appraisal. They each made an independent appraisal pursuant to the prescribed methods of the Department of Revenue which involved extensive work in the field. Sizemore appraised the land on the basis of what the land would grow while Robertson appraised as hardwood if hardwood was then growing on the land. The tax assessor’s witness Boyd had taken no soil samples and made only “between 20 and 25” tree borings in the 87,000 acres involved in this suit. St. Joe’s expert witness Sizemore, on the other hand, took “three or four hundred tree borings” and “4,200 to 4,300 soil borings” in following the methods prescribed by the Department of Revenue.
*531 The valuations placed by the various witnesses on this tract of timberland are as follows:
1971
Appellee's Assessment $4,955,335.00
Appellee's Witness Boyd 4,981,719.28
Appellee's Witness Merriam 8,076,651.00
St. Joe's Witness Sizemore 4,041,061.00
St. Joe's Witness Robertson 3,651,546.00
1972
Appellee's Assessment $4,955,335.00
Appellee's Witness Boyd 5,980,203.00
Appellee's Witness Merriam 8,076,651.00
St. Joe's Witness Sizemore 3,217,188.00
St. Joe's Witness Robertson 2,960,366.00
1973
Appellee's Assessment $4,955,335.00
Appellee's Witness Boyd 8,511,779.26
Appellee's Witness Merriam 8,076,651.00
St. Joe's Witness Sizemore 4,504,021.00
St. Joe's Witness Robertson 3,952,292.00
The tax assessor failed to meet the burden of proof imposed upon him by the above quoted § 195.032, Florida Statutes 1971, in that having declined to follow and apply the standard measures of value established by the Department of Revenue, he failed to overcome by a preponderance of the evidence the presumption that an appraisal through the use of such standards is superior to the appraisal methods used by him in making his assessments of the agricultural lands involved in this suit for the years 1971, 1972 and 1973. Compare Container Corporation of America v. Long, Fla.App.(lst), 274 So.2d 571 (1973), and Container Corporation of America v. Rutherford, Fla.App.(lst), 293 So.2d 379 (1974).
The judgment appealed from is, therefore, reversed and the case is remanded with directions for further proceedings consistent with the ruling herein.
Reversed and remanded with direction.
BOYER, C. J., and LEE, THOMAS E., Associate Judge, concur.